**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

MICHIGAN BRICKLAYERS AND ALLIED
CRAFTWORKERS HEALTH CARE FUND et al.,

      Plaintiffs,

v.

                                 Case No. 05-CV-72104-DT

CHRISTIN MASONRY, INC. et al.,

      Defendants.
                                        /

**ORDER GRANTING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND
DENYING AS MOOT PLAINTIFFS' MOTION TO EXTEND AND
RENEWED MOTION FOR SANCTIONS**

Plaintiffs initiated this action on May 27, 2005, seeking to collect unpaid fringe benefit contributions pursuant to 29 U.S.C. § 1132 of the Employment Retirement Income Security Act ("ERISA"). After various procedural delays caused exclusively by the conduct of Defendants, the matter is now before the court on two motions for summary judgment filed by Plaintiffs: a motion for summary judgment against Defendant Christin Masonry, Inc. ("CMI") and a motion for summary judgment against Defendants Kristine L. Wargo and Jeff Wargo.[1] The individual Defendants have filed an opposition brief to the motion against them, but no response was filed to the motion against Defendant CMI. Having reviewed the briefs, the court finds a hearing to be

---

[1] The court commends Plaintiffs' counsel on the preparation of the two summary judgment briefs. The court's standard language in its scheduling order sets forth the procedures to follow when filing summary judgment motions, (*see* 9/27/05 "Scheduling Order" at 9-11), yet it is rare that these procedures are followed as carefully as Plaintiffs' counsel did in this case. Such motion briefs, well-supported with precise citations, not only serve the client's interests, but also streamline issues before the court. The court appreciates the extra time expended to produce well-organized briefs.

unnecessary. See E.D. Mich. LR 7.1(e)(2). The court will grant Plaintiffs' motions for summary judgment and deny as moot Plaintiffs' other pending motions.

## I. STANDARD

Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment motions, provides in part that:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and summary judgment is to be entered if the evidence is such that a reasonable jury could find only for the moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Mt. Lebanon Per. Care Home, Inc. v. Hoover Univ., Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). It is not necessary for the moving party to support its motion with affidavits or other similar forms of evidence; rather, the movant need only show that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The moving party may meet his initial burden by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his case. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). If the moving party meets this initial burden, the non-moving party must then present admissible evidence establishing a genuine material issue of fact. *Id.* The non-moving party cannot rely on the hope that the trier of fact will disbelieve the

movant's denial of a disputed fact, but must "present affirmative [admissible] evidence in order to defeat a properly supported motion for summary judgment." *Id.* The party who bears the burden of proof at trial must present evidence establishing a jury question as to each element of his claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000).

Failure to present sufficient evidence on an essential element of a claim or defense renders all other facts immaterial for purposes of summary judgment. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). Although the non-moving party is entitled to a review of the evidence in the light most favorable to him, he is required to do more than simply show that there is some "metaphysical doubt as to the material facts." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994) (quoting *Matsushita Elec. Ind. Co.*, 475 U.S. at 586)).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 250. Therefore, the court must necessarily examine the evidence provided in a light that is most favorable to the non-moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), and decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," *Anderson*, 477 U.S. at 251-252.

## II. PLAINTIFFS' MOTION AGAINST DEFENDANT CHRISTIN MASONRY

Plaintiffs bring this action pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1001 *et seq.* Sections 502 and 515 of ERISA give a district court subject matter jurisdiction to hear an action brought by benefit plan trustees to enforce an employer's promise to make fringe benefit

contributions.  *See* 29 U.S.C. §§ 1132(e)(1) and 1145; *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 312-13 (8th Cir. 1990); *see also Laborers Health and Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 547 (1988) ("The liability created by § 515 may be enforced by trustees of a plan by bringing an action in federal district court pursuant to § 502."). Under 29 U.S.C. § 1145:

> Every employer who is obligated to make contributions to a multiemployer plan under terms of the plan or under the terms of a collectively bargained agreement shall, to the extend not inconsistent with law, make such contributions of such plan or agreement.

29 U.S.C. § 1145.

In their motion against Defendant CMI, Plaintiffs present facts which establish that CMI entered into collective bargaining agreements ("CBAs") with Defendants, pursuant to which CMI was required to remit contributions to each of the Plaintiff funds based on all hours of covered work performed by their employees. (*See* J. Wargo Dep. at Ex. 2, Pls.' Ex. A; *see also* CBAs, Pls.' Exs. F & G.) Although Defendant CMI attempted to terminate the CBA on July 30, 2003, (J. Wargo Dep. at Ex. 2, Pls.' Ex. A), after Plaintiffs disputed this attempted termination, CMI eventually agreed to be bound by the CBAs. (*Id.* at 59-60; *id* at Ex. 8.) Plaintiffs' motion also provides sufficient facts to establish that, although required by the relevant CBAs, CMI never submitted any contribution reports or contributions. (J. Wargo Dep. at 60, Pls.' Ex. A.)

During the pendency of this lawsuit, Defendant CMI produced payroll records for Plaintiffs' auditor, Joni Holmgren. (*See* Pls.' Ex. C.) The audit revealed that Defendant CMI owed benefit contributions for the period of May 2003 through September 2005 in the amount of $63,085.93. (*Id.* at ¶ 15.) After Plaintiffs filed liens and made bond claims on this amount on two projects that CMI was performing, the general contractor

4

for one of the projects issued a check made payable to CMI or to Plaintiffs in the amount of $11,418.65.  (*Id.* at ¶ 16.)  Plaintiffs have credited this amount toward the total amount owed, leaving a balance of $51,667.28.  (*Id.*)  The auditor also calculated audit assessments and interest owed by CMI in the total amount of $13,759.23, (*id.* at ¶¶ 17-18), and audit fees owed in the amount of $1,359.30, (*id.* at ¶ 19).[2]  Plaintiffs therefore initially sought a total amount of $66,785.81 in unpaid benefit contributions and related costs.  (Pls. Br. at 18.)  This amount does not include any future request for attorney fees or amounts owed to entities who are not parties to this lawsuit.  (*Id.* at 17-18 & 17 n.7; *see also* Pls.' Ex. C at ¶ 15.)

On March 28, 2006, Plaintiffs' auditor submitted a supplement affidavit in which she averred that another $7,072.05 was credited to CMI's amount owed, through a check she received for "the Madison Lofts project."  (*See* 3/28/06 Aff. at ¶¶ 3-4, Dkt. # 51.)  She further testified that all other amounts owed by CMI were as noted in her original affidavit.  Under this undisputed evidence, therefore, CMI's liability is reduced from $66,785.81 to $59,713.76.

Having reviewed Plaintiffs' motion against CMI, along with the relevant admissible evidence, the court determines that Plaintiffs have met their burden of establishing an absence of a material fact regarding Defendant CMI's liability in the amount of $59,713.76.  *See Betkerur*, 78 F.3d at 1087 (citing *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479-80 (6th Cir.1989) ("The movant must meet the initial burden

---

[2]These amounts are allowed under 29 U.S.C. § 1132, which provides that the court shall award "interest on the unpaid contributions . . . reasonable attorney's fees and costs of the action, to be paid by the defendant, and **. . .** such other legal or equitable relief as the court deems appropriate."  29 U.S.C. § 1132(g)(2).

of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.").

In response to Plaintiffs' motion and supporting facts, Defendant CMI has failed to present any facts or averments to dispute Plaintiffs' evidence of liability.  (*See id.* (citing *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479-80 (6th Cir.1989) ("The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"); *see also* 9/27/05 "Scheduling Order" at 10 ("A fact not contested in the response is deemed uncontroverted."). Indeed, while the individual Defendants filed a response to Plaintiffs' motion for summary judgment against, no response was filed to Plaintiffs' motion for summary judgment against CMI.  The court therefore concludes that Plaintiffs are entitled to judgment as a matter of law against Defendant CMI in the amount of $59,713.76.

### III. PLAINTIFFS' MOTION AGAINST DEFENDANTS KRISTINE AND JEFF WARGO

In Plaintiffs' motion for summary judgment against Kristine and Jeff Wargo (collectively, the "Wargos" or the "individual Defendants"), Plaintiffs argue that the individual Defendants are liable for the CBAs to which CMI was bound, under an alter ego/piercing the corporate veil theory.  Plaintiffs also argue that the Wargos are liable as a matter of law for breach of their fiduciary duties.

#### A.  BACKGROUND

As an initial matter, the court finds that the facts establishing liability for CMI are undisputed both for purposes of the summary judgment motion against CMI as well as for purposes of the summary judgment motion against the individual Defendants.  In

6

their motion against the individual Defendants, Plaintiffs specifically "incorporate by reference the statement of material facts set forth in their summary judgment motion and brief as to Defendant Christin Masonry." (Pls.' Mot. Br. at 1.) In response, Defendants "neither admit nor deny the statement of facts with regard to the Summary Judgment Motion as to Defendant, Christin Masonry, Inc., as the same are irrelevant to the inquiry set forth in Plaintiffs' Motion against the individual Defendants." (Defs.' Resp. at 4.) The court disagrees that the facts set forth in the motion against CMI are irrelevant to the motion before the court in relation to the motion against the individual Defendants. Inasmuch as the Plaintiffs seek to pierce the corporate veil and hold the Wargos responsible for the liability of CMI, the facts which establish the liability of CMI are necessarily relevant to this inquiry. The court finds that Plaintiffs' facts establishing the liability of CMI, incorporated by reference and uncontested by the individual Defendants, are undisputed. *See* 9/27/05 "Scheduling Order" at 10 ("A fact not contested in the response is deemed uncontroverted."). Accordingly, the court accepts as a matter of law, for purposes of the motion against the Wargos, the factual premise that CMI is liable to Plaintiffs for unpaid fringe benefit contributions and associated fees in the amount of $59,713.76.

Indeed, most of the facts asserted in Plaintiffs' motion against the individual Defendants are undisputed. Instead, Defendants argue that the facts are "irrelevant" to the issues before the court. Plaintiffs have set forth facts which establish that CMI was established in 1996, just as its bankrupt predecessor, Christian Masonry, ceased operations. When CMI was formed, it had "a mixer, a few pieces of scaffold, maybe a beat up truck." (J. Wargo Dep. at 8, Pls.' Ex. A; K. Wargo Dep. at 29-30, Pls.' Ex. B.)

7

Kristine Wargo was the sole incorporator of CMI and has been the sole officer of CMI since its formation. (Pls.' Mot. Br. at 1; Defs.' Resp. at 5.) A $50 fee was paid to the State of Michigan so that CMI would have 60,000 authorized shares. (Pls.' Mot. Br. at 2; Defs.' Resp. at 5.) Kristine Wargo testified that although she is the sole shareholder of CMI, she is not sure how many shares of the company she owns. (K. Wargo Dep. at 8-11.) A review of Ms. Wargo's deposition transcript reveals that she does not understand the difference between authorized and issued shares. (*Id.*; Pls.' Resp. at 5.) Defendants also admit that "certain corporate formalities have not been observed by [CMI]." (Pls.' Resp. at 5.) For example, there have been no shareholder meetings, no officer meetings, and no officer elections. (K. Wargo Dep. at 19; Pls.' Ex. B.) There is no written agreement between Ms. Wargo and CMI establishing her officer compensation. (*Id.* at 19-20.) Ms. Wargo also testified that she did not recall paying any money for her shares in CMI. (K. Wargo Dep. at 11, Pls.' Ex. B.) Although Ms. Wargo has served as corporate Treasurer, Secretary, President and Vice President, she testified that there have never been any written documents establishing the duties of the corporate President, Treasurer or Secretary. (*Id.* at 15-16.) CMI has never had any corporate Directors. (*Id.* at 16.) There have never been any dividends declared on shares of CMI stock. ( Pls.' Mot. Br. at 4; Defs.' Resp. at 6.)

     With respect to Jeff Wargo, Plaintiffs have submitted facts indicating that he signed the relevant CBA as Vice-President of CMI, and has signed many other documents as CMI's Vice-President, despite the fact that the corporate records filed with the state of Michigan do not show the existence of a corporate Vice-President and Ms. Wargo has testified she is the sole officer of CMI. (Pls.' Mot. Br. at 3.) In response,

8

Defendants admit that "Jeff Wargo played a significant role in the operation of [CMI] and was authorized to sign contracts on its behalf."  (Defs.' Resp. at 6.)

CMI has always been operated out of the Wargos' residence, and there has never been a written agreement between CMI and the Wargos regarding the use of the residence.  (Pls.' Mot. Br. at 4; Defs.' Resp. at 6.)  CMI has never paid the Wargos for use of the residence.  (Pls.' Mot. Br. at 4; Defs.' Resp. at 6.)  The telephone number for the Wargos' residence is used for business as well as personal calls, and the telephone bill is paid entirely from the Wargos' personal assets.  (Pls.' Mot. Br. at 4; Defs.' Resp. at 6.)  The utility bills and mortgage payments are also paid entirely from the Wargos' personal assets.  (Pls.' Mot. Br. at 4; Defs.' Resp. at 6.)  Jeff Wargo made several loans to CMI, which were not set forth in written in agreements, and many of which were not repaid.  (J. Wargo Dep. at 23-24, Pls.' Ex. A.)  Indeed, Plaintiffs admit that "Jeff Wargo financially supported [CMI] from his personal assets."  (Pls.' Resp. At 6.)

Kristine Wargo also made and received various loans from CMI.   Although these loans were reflected on tax returns and check registers, they were not memorialized in any written agreements between Ms. Wargo and CMI.  (Pls.' Mot. Br. at 5; Defs.' Resp. at 6.)  Further, CMI obtained a loan from Jeff Wargo's friend, Daren Bernhardt, which was memorialized in an agreement between Mr. Bernhardt and Mr. Wargo, not CMI.  (Pls.' Mot. Br. at 6; Defs.' Resp. at 7.)

Plaintiffs have submitted the non-payroll check register of CMI, which shows that CMI's assets were used to pay the personal credit cards of the individual Defendants.  (See K. Wargo Dep. at Ex. 7, Pls.' Ex. B.)  In response, Defendants contend, without factual citation, that "[b]oth Mr. and Mrs. Wargo were very clear in their deposition

9

testimony that [CMI's] funds were used to pay only for direct business expenses incurred." (Pls.' Resp. at 7.) Later in their response, Defendants cite pages 41 through 56 of Ms. Wargo's deposition testimony for the proposition that "it is clear through deposition testimony that the Wargos were very careful to separate business from personal expenses and only used corporate funds for business expenses." (Pls.' Resp. at 9.) A review of the cited deposition testimony, however, does not reveal that Ms. Wargo testified to the effect paraphrased by Defendants' attorney. Indeed, the cited testimony only details, exactly as Plaintiffs' attorney has cited, that certain credit cards were held in CMI's name or in the individual Defendants' names. The cited testimony also elaborates on loans made to and by CMI. Nowhere in this cited testimony, however, does Ms. Wargo state or infer that the Wargos were "very careful to separate business from personal expense and only used corporate funds for business expense." (Defs.' Resp. at 9.) Accordingly, the court rejects this asserted "fact" as unsupported and, indeed, contrary to the great weight of evidence submitted by Plaintiffs.

All the legal bills for the individual Defendants, as well as for CMI, arising out of this action have been paid by CMI. (K. Wargo Dep. at 63, Pls.' Ex. B.)

The individual Defendants both made decisions about company expenditures, and used the company's credit cars. (Pls.' Mot. Br. at 8; Defs.' Resp. at 7.) Ms. Wargo also signed the company checks. (Pls.' Mot. Br. at 8; Defs.' Resp. at 7.) As discussed above, it is undisputed that CMI entered into a CBA which required them to remit the benefit contributions to Plaintiffs. It is also undisputed that these contributions were not made and CMI is liable in the amount of $59,713.76.

Defendants assert, and Plaintiffs do not substantively challenge that CMI was properly formed and has operated in good standing under the laws of the state of Michigan. (Defs.' Resp. at 8.) Defendants also assert that CMI's financial records have been maintained separate from the Wargos' personal records, and that compensation to Ms. Wargo was separately accounted for and itemized on CMI's tax returns. Defendants' also claim that CMI was adequately capitalized by the Wargos "upon its initial formation and subsequently." (*Id.*)

### B. DISCUSSION

After reviewing these essentially undisputed facts in a light most favorable to Defendants, the court concludes as a matter of law that the individual Defendants are personally liable for the $59,713.76 owed by Defendant CMI.

Under the facts as asserted by Plaintiffs, and uncontradicted by Defendants, the court finds as a matter of law that there are substantial reasons to pierce the corporate veil. The Sixth Circuit has held that the corporate veil may be pierced in ERISA cases where "there are substantial reasons for doing so." *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.,* 872 F.2d 702, 704 (6th Cir. 1988). The Sixth Circuit held:

> Appellants' main contention on appeal is that Sidney Weinberger is not the alter-ego of Weinberger Homes, Inc. It is true that there is a presumption that a corporation is a separate entity from its shareholders. *Contractors, Laborers, Teamsters & Engineers Health Plan v. Hroch,* 757 F.2d 184, 190 (8th Cir.1985) (citing *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.,* 519 F.2d 634, 638 (8th Cir.1975)). However, a court can pierce the corporate veil if "there are substantial reasons for doing so" after weighing: (1) the amount of respect given to the separate entity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity; and (3) the fraudulent intent of the incorporators. *Id.* (citing *Seymour v. Hull & Moreland Engineering,* 605 F.2d 1105, 1109 (9th Cir.1979)). Factors to be

11

> considered include undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham. *Id.* (citing *Lakota,* 519 F.2d at 638).

*Id.* at 704-05. In *Weinberger Homes*, the Sixth Circuit pierced the corporate veil where the individual defendant

> "loaned" money to the corporation with no formal agreements, . . . paid expenses of the corporation out of his pocket, the corporation paid personal expenses of [individual defendant], the corporation was operated solely for [individual defendant's] personal benefit, records of various expenses were generally inadequate, and [individual defendant] withdrew money from the corporate entity when the corporation ended while some creditors were left unpaid.

*Id.* at 705. Likewise, Plaintiffs cite to the First Circuit's opinion in *Alman v. Danin*, 801 F.2d 1 (1st Cir. 1986), in which the corporate veil was pierced where the company's board of directors never met, corporate records were not maintained, and the company was inadequately capitalized. *Id.* The court pierced the veil partly because, inasmuch as the incorporators "could not have expected Mohawk to be able to pay its debts, the court inferred that both men, being Mohawk's principles, had acted in bad faith in their dealings with the union." *Id.* at 4. The court finds these cases to be remarkably similar to the instant case in which the undisputed facts reveal that little regard was given by the Wargos to corporate form: corporate meetings were not held; loans were not memorialized or, in some circumstances, repaid; and finances and assets were co-mingled. While Defendants assert that separate financial records were kept, this is of little consequence when a review of those records indicates that company assets were being used to pay personal liabilities.

12

Plaintiffs cite to additional cases which are also analogous to the facts of this case. For example, in *Connors v. Princeton Coal Group, Inc.,* 770 F.Supp. 1132, 1139 (S.D.W.Va. 1991), the court held that holding the individual defendants was appropriate where, among other things, the corporate defendants were grossly undercapitalized, corporate meetings were not held, no formal accounting records were regularly kept aside from payroll records, stock certificates or dividends were not issued by the corporate defendants, and revenues generated by the corporate defendants were routinely transferred to other companies or to the individual defendants themselves. *Id.* Further, in a case in this district, Judge Gadola held the individual defendant liable in an ERISA matter with facts almost identical to the facts of this case. See *Michigan Laborers' Health Care Fund v. Taddie Const., Inc.,* 119 F.Supp. 2d 698, 703 (E.D. Mich. 2000). In *Taddie*, the court held:

> Mr. Taddie was the sole-shareholder, president, vice-president, secretary, and treasurer of the corporation; his compensation was not set forth in any document; and he made loans to he corporation of roughly $250,000, of which only about $20,000 was ever paid back. Mr. Taddie ostensibly recorded those loans on paper, but he could not adduce evidence that those papers included terms of repayment. Mr. Taddie avers that he observed corporate formalities, but was unable to produce any minutes of corporate meetings or show that the corporation ever declared any dividends. These facts suffice to establish that the corporation was a mere instrumentality of Mr. Taddie.

*Id.* at 703. The *Taddie* court pierced the corporate veil where, as here, the individual defendant used the corporate form to improperly fail to pay ERISA fringe benefit contributions and the plaintiff funds suffered a loss as a result. *Id.*

Defendants' marginal attempts to distinguish these cases are to no avail. Defendants argue, for example, that *Taddie* is distinguishable because the court there held the individual defendant liable due to the defendant's violation of Michigan law

13

(carrying on business not related to the winding up of corporate affairs during the period that the corporation was dissolved).  (Defs.' Br. at 11.)  The *Taddie* court makes clear, however, that this basis for liability was an alternative theory of relief to the alter ego theory and that Plaintiffs were entitled to judgment under both theories.  *Taddie Const.*, 119 F.Supp. 2d at 703.  Defendants also attempt to distinguish *Wienberger Homes* and *Alman* by focusing on minor variations in the facts of those cases to the facts before the court.  (Defs. Br. at 10-11.)  While the court agrees that the facts of those cases are not *exactly* identical to those present in this case, they are, as discussed above, largely similar.  The court is persuaded that, under the principles articulated in *Alman*, *Weinberger Homes, Taddie,* and *Connors*, it is proper to impose individual liability on the Wargos in this case.

Defendants further argue that piercing the veil is not appropriate because, according to Defendants, "[p]ersonal assets were pledged to fund company operations which were not repaid."  (Defs.' Resp. at 14.)  Defendants apparently contend that it is proper to co-mingle funds so long as the funds flow from the individual to the company rather than vice versa.  As Plaintiffs point out, however, this is simply not the law of this circuit.  (Pls.' Br. at 4 (citing *Weinberger Homes*, 872 F.2d at 702 and *Taddie Const.*, 119 F.Supp. 2d at 703).)

Rather, the court finds that the corporate veil must be pierced in this case where, among other things, loans were made without written memorialization and without always being repaid, corporate meetings were not held, corporate funds were used to pay personal accounts without sufficient explanatory documentation, personal assets (such as telephones, utilities, and a residence) were used without compensation, stock

certificates were not issued, officers were not elected nor their duties established in writing and the corporate form was generally not respected. The court also finds that the veil must be pierced to avoid the injustice which would result if the individual Defendants were not held liable and CMI's liability went unpaid. As the court held in *Connors*,

> Distilled to its essence, the operations of the corporate defendants amounted to a money making enterprise of the individual defendants. The Court firmly believes that it would be grossly unfair to the Funds and its trustees and contrary to ERISA principles to permit the individual defendants to take cover behind the corporate form of their mining enterprises and escape personal accountability for nonpayment and underpayment to the Funds in violation of the 1984 and 1988 Wage Agreements. Justice requires that the individual defendants be held accountable for the debts owed to the Funds.

*Connors v. Princeton Coal Group, Inc.,* 770 F.Supp. 1132, 1139 (S.D. W.Va. 1991). The court will not allow the individual Defendants to hide behind the corporate form. This is particularly true in ERISA cases where, as the First Circuit has explained, too much deference to the corporate form is contrary to the purposes of ERISA. *Alman,* 801 F.2d at 3-4. The *Alman* court held:

> ERISA, the statute sought to be enforced here, cannot be said to attach great weight to corporate form. Indeed, deferring too readily to the corporate identity may run contrary to the explicit purposes of the Act. Congress enacted ERISA in part because many employees were being deprived of anticipated benefits, which not only reduced the financial resources of individual employees and their dependents but also undermined the stability of industrial relations generally. *See* 29 U.S.C. § 1001 (1982) (statement of congressional findings and declaration of policy); H.Rep. No. 807, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad. News 4639, 4670, 4676.  Allowing the shareholders of a marginal corporation to invoke the corporate shield in circumstances where it is inequitable for them to do so and thereby avoid financial obligations to employee benefit plans, would seem to be precisely the type of conduct Congress wanted to prevent.

*Id.*; *see also Weinberger Homes*, 872 F.2d at 705 (citing with approval *Alman* court's holding that "deference to the corporate identity may be particularly inappropriate in relation to ERISA because Congress enacted ERISA in part to protect employees who were being deprived of anticipated benefits by a corporate sham.").

Accordingly, the court will grant Plaintiffs' motion and hold the individual Defendants and CMI jointly liable for $59,713.76 in unpaid fringe benefit contributions and associated costs.

The court will also grant Plaintiffs' motion for summary judgment with respect to their argument that the Wargos breached their fiduciary duties. Plaintiffs have presented undisputed evidence that Defendants failed to comply with their fiduciary duty to pay the required benefit contributions. In response, Defendants state only that "[t]here are obviously genuine issues of material fact as to whether the Wargos acted properly in a fiduciary capacity with regard to the funds received by [CMI] during the period May 2003 through December 2005." (Defs.' Br. at 14.) Defendants do not elucidate what those "genuine issues" are. There is no dispute that CMI owed the money. There is no dispute that the money was not paid. There is no dispute that both of the individual Defendants maintained control over CMI's funds and expenditures. (Pls. Mot. Br. at 8; Defs.' Resp. at 7.) As such, the court concludes that the Wargos are individually liable for their breach of fiduciary duties. *See Operating Engineers' Local 324 Fringe Benefit Funds v. Nicolas Equipment, L.L.C.,* 353 F.Supp.2d 851, 854 (E.D.Mich. 2004) (Edmunds, J.) (holding individual personally liable for breach of fiduciary duty where he exercised discretionary control over funds designated for deposit into the subject ERISA Funds and did not make the required contributions); *see*

*also Iron Workers' Local No. 25 Pension Fund v. McGuire Steel Erection, Inc.*, 352 F.Supp.2d 794, 806 (E.D.Mich. 2004) (Zatkoff, J.) ("[G]iven Defendant McGuire's admission that he was responsible for the day-to-day operation of Defendant McGuire Steel, including the decision of whether or not to pay ERISA benefit contributions, no reasonable jury could find that he did not act in a fiduciary capacity."). The court will therefore grant Plaintiffs' motion on this issue as well.[3]

## IV.  CONCLUSION

For the reasons stated above, Plaintiffs' motion for summary judgment against Defendant CMI [Dkt. # 48] is GRANTED and Plaintiffs' motion for summary judgment against Defendants Jeff Wargo and Kristine Wargo [Dkt. # 49] is GRANTED. Defendants CMI, Jeff Wargo and Kristine Wargo will be held jointly and severally liable to Plaintiffs in the amount of $59,713.76.  IT IS FURTHER ORDERED that Plaintiffs shall submit a proposed judgment within **seven days** of the date of this order.

---

[3] The court notes that even if it did not grant Plaintiffs' motions for summary judgment against all three defendants, the court would nonetheless grant Plaintiffs' February 7, 2006 motion for sanctions and issue a judgment against the three defendants for their failure to comply with discovery obligations.  While the court recognizes that such a sanction is a drastic and harsh result, the unique procedural history of this case warrants such a result.  *See* Fed. R. Civ. P. 37(b)(2).  Defendants have been consistently and stubbornly unresponsive from the initiation of this matter.  In this court's January 6, 2006 order, the court outlined Defendants' behavior and clearly advised them that any further failure to adhere to their responsibilities as litigants to this case could result in entry of a default judgment against them.  (*See* 1/6/06 Order at 3.)  Defendants, however, did not comply with the court's January 6, 2006 order and, if summary judgment were not otherwise granted, the court would grant Plaintiffs' February 7, 2006 motion for sanctions and issue a judgment against Defendants.

Finally, IT IS ORDERED that Plaintiffs' motion to extend [Dkt. # 40] and "Renewed Motion for Sanctions" [Dkt. # 42] are DENIED AS MOOT.

        S/Robert H. Cleland
        ROBERT H. CLELAND
        UNITED STATES DISTRICT JUDGE

Dated:  May 10, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 10, 2006, by electronic and/or ordinary mail.

        S/Lisa G. Wagner
        Case Manager and Deputy Clerk
        (313) 234-5522